U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

2023 DEC 20  PM 4: 01

CLERK

BY_____
DEPUTY CLERK

KRISTY CRAWFORD,          )
    Plaintiff               )
                    )
                    )
       v.              )    Case No. 2:23-cv-752
                    )
MONSANTO COMPANY, SOLUTIA, INC.,  )    **JURY TRIAL DEMANDED**
PHARMACIA, L.L.C., PHARMACIA, INC.,  )
and PHARMACIA CORP.,      )
    Defendants             )

## COMPLAINT

1.     Plaintiff Kristy Crawford brings this complaint against Defendants Monsanto Company, Solutia, Inc., Pharmacia L.L.C., Pharmacia, Inc., and Pharmacia Corporation (together, "Defendants"), and alleges on personal knowledge, investigation of her counsel, and information and belief as follows:

### Nature of Action

2.     Plaintiff Kristy Crawford attended Twin Valley Elementary School ("Twin Valley") from 1982 to 1990, attending pre-kindergarten through 6th grade. As proximate contributory cause of Defendants' wrongful and tortious conduct, Kristy Crawford was exposed to toxic Polychlorinated Biphenyls ("PCBs") during the course of her attendance of Twin Valley, and suffered adverse medical consequences, including but not limited to fast growing b-cell lymphoma also known as a type of Non-Hodgkin Lymphoma, reproductive issues, personal injuries, and emotional distress.

3.     In 2023, Twin Valley investigated and revealed highly elevated PCB levels in multiple school rooms, facilities, the library, and gym. Twin Valley attempted to implement

gravel &
shea
A PROFESSIONAL CORPORATION
76 St. Paul Street
Post Office Box 369

corrections intended to reduce the PCB levels in the affected areas, but their attempts instead resulted in raised PCB levels. Upon being unable to remedy the situation swiftly, Twin Valley closed several rooms, the library, and gym. Twin Valley was forced to find new spaces for classes and activities that previously utilized the now unavailable toxic facilities. Some Twin Valley classrooms, the library, and gym remain shut down at the time of filing this complaint.

4.     Monsanto began manufacturing PCBs and/or PCB-like chemicals around the 1930s and continued to manufacture commercial PCBs, including PCBs used in electrical equipment applications and put to several uses and applications in school facilities and buildings, including Twin Valley, through the 1940s, 1950s, 1960s, and the 1970s. Further, in an effort to monopolize the PCB manufacture and distribution, Monsanto purchased Swann Chemical Company in Alabama.

5.     Monsanto's chemical operations and businesses have caused indoor and outdoor environmental pollution across the United States, including at Twin Valley, consisting of PCBs and other harmful laboratory created chemical compounds.

6.     Defendants' intentional production and promotion of PCBs as a construction material throughout more than half a century, when Defendants knew that PCBs are highly toxic, is a legal cause of the damages Kristy sustained because Twin Valley would not have been contaminated with toxic PCBs but for Defendants' illegal conduct.

7.     Defendants concealed the toxic nature of PCBs from the public and continue to deny their duty to compensate the victims of their intentional wrongdoing in PCB litigation across the country. Further, to make matters worse, Defendants are also actively failing to clean up the toxic PCBs they sold across the country to line their pockets.



gravel &
shea
A PROFESSIONAL CORPORATION
76 St. Paul Street
Post Office Box 369

- 2 -

Parties

8.    Plaintiff Kristy Crawford ("Kristy") is a citizen of Windham County, Vermont.

9.    Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its

principal place of business in Missouri. Monsanto is registered to do business in Vermont and

can be served via its registered agent. Corporation Service Company. The original Monsanto,

prior to the formation of its Solutia and Pharmacia entities, used to operate primarily in three

business areas: agriculture, chemicals, and pharmaceuticals. Today, Monsanto continues to

operate its agriculture branch, while Solutia operates the original Monsanto chemical branch, and

Pharmacia operates the original Monsanto pharmaceutical branch. Throughout its corporate

history, Monsanto has entered into agreements, consolidated assets, merged, sold parts of its

business, and engaged in a myriad of other transactions with Solutia, Pharmacia, and others to

reduce or hide from PCB-related liabilities. Monsanto knows that the Defendants herein,

including itself, have failed to take action to abate, remediate, minimize, publicize, or protect

teachers and children in school facilities, including Twin Valley, in the United States that contain

PCBs.

10.    Defendant Solutia, Inc. ("Solutia") is a Delaware corporation with its principal

place of business in Missouri. Solutia is registered to do business in Vermont and can be served

via its registered agent. United Agent Group Inc.

11.    Defendant Pharmacia L.L.C. ("Pharmacia") is formerly known as Pharmacia

Corporation and is related to Monsanto. Pharmacia L.L.C. is a Delaware limited liability

corporation and is a citizen of the states of New York and Delaware. Pharmacia L.L.C. is now a

wholly owned subsidiary of Pfizer, Inc. Pharmacia L.L.C. is registered to do business in Vermont

and can be served via its managing agent.



gravel &
shea   A PROFESSIONAL CORPORATION

- 3 -

76 St. Paul Street
Post Office Box 369

12.     Defendant Pharmacia Inc. is a foreign corporation with its principal place of business in New Jersey. Pharmacia, Inc. can be served by the managing agent.

13.     Defendant Pharmacia Corporation is a foreign corporation with its principal place of business in New Jersey. Pharmacia Corporation can be served by the managing agent.

14.     Defendants Monsanto, Solutia, and Pharmacia have entered into complex corporate transactions and agreements that determine their respective legal and financial obligations, responsibilities, and liabilities related to original Monsanto's manufacture or sale of PCBs.

15.     Upon information and belief, Solutia agreed to indemnify Monsanto and or Bayer and Pharmacia for certain liabilities related to original Monsanto's chemical business. Through a multitude of agreements, Monsanto, Solutia, Bayer, and Pharmacia share or apportion liabilities, and/or indemnify one or more entities, for claims arising from original Monsanto's chemical business, including the manufacture and sale of PCBs. Defendants' insurers are aware and participated in this process.

16.     In 2003, Solutia filed a voluntary petition for reorganization under Chapter 11 of the U.S. Bankruptcy Code. Solutia's reorganization was completed in 2008. In connection with Solutia's Plan of Reorganization, Solutia, Pharmacia, and Monsanto entered into several agreements under which Monsanto continues to manage and assume financial responsibility for certain tort litigation and environmental remediation related to the chemicals business. Monsanto, Solutia, and Pharmacia are jointly and or severally liable under state tort law for contaminating Twin Valley with toxic PCBs and poisoning Kristy during her nine years of attending Twin Valley. These Defendants may be obligated to one another in contract for PCB tort liabilities as set out in their complex corporate agreements.



gravel &
shea

- 4 -

A PROFESSIONAL CORPORATION
76 St. Paul Street
Post Office Box 369

## Jurisdiction and Venue

17.    The causes of action and most of the facts alleged herein occurred in this judicial district. Kristy was exposed to Defendants' PCBs in Windham County, Vermont.

18.    The tortious conduct, wrongful acts and omissions, and the injuries and damages of Kristy also occurred in Windham County, Vermont.

19.    The amount in controversy exceeds $75,000.00 exclusive of interest and costs.

20.    The Court has subject matter jurisdiction pursuant to 28 U. S. C. § 1332 based on diversity of citizenship and amount in controversy.

21.    Venue is appropriate in this district pursuant to 28 U. S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim is situated in this judicial district.

## Background Facts

22.    PCBs are a mixtures of synthetic organic chemicals comprised of chlorine atoms attached to a double-hydrogen ring (a "biphenyl" ring). PCBs have no taste or smell and range in consistency from an oil to a waxy solid.

23.    PCBs are comprised of many similar semi-volatile chemicals called congeners. A "PCB congener" is any single, unique chemical compound in the PCB category. Over 200 congeners have been identified. *See* America's Children and the Environment, Third Edition, U.S. Environmental Protection Agency (2013).

24.    From approximately 1929 to 1977, Monsanto was the only manufacturer of PCBs in the United States for commercial use.

25.    The most common trade name for PCBs in the United States is "Aroclor. " 21 CFR § 500.45(a) ("Polychlorinated biphenyls (PCBs) represent a class of toxic industrial


gravel &
shea A PROFESSIONAL CORPORATION
76 St. Paul Street
Post Office Box 369

- 5 -

chemicals manufactured and sold under a variety of trade names, including Aroclor (United States)"). Aroclor is or was trademarked by Monsanto.

26.    "Between 1929 and 1977, more than 1.25 billion pounds of PCBs were produced in the United States." Agency for Toxic Substances and Disease Registry ("ATSDR") 2014. Case Studies in Environmental Medicine: Polychlorinated Biphenyls (PCBs) Toxicity, U.S. Dep't Health & Human Services, at 21.

27.    PCBs are extremely toxic to humans and wildlife." *Environmental Defense Fund v. Environmental Protection Agency*, 636 F.2d 1276, 1270 (D. C. Cir. 1980).

28.    PCBs are a "keystone pollutant" and "a prime motivator for the enactment of the TSCA," the Toxic Substances Control Act. "By most accounts, PCBs are the archetypical chemical villains against which the contemporary pollution laws are directed. " Rodgers & Burleson, *Polychlorinated biphenyls* (PCBs), 3 Envtl. L. (West) §6:9 (July 2017).

29.    By the late 1970s, the United States banned the "manufacture, processing, distribution in commerce, and use of polychlorinated biphenyls (PCBs)." 44 Fed. Reg. 31514 (May 31, 1979). This ban remains in effect today.

A.    PCBs are among the most stable chemicals known and decompose very slowly. once they are in the environment... In the environment, PCBs are toxic at low level concentrations to a wide variety of species, marine mammals included. Once PCBs reach the environment, they tend to stay there, or move slowly in damaging cycles... " Rodgers & Burleson, citing in part Response to Exemption Petitions, 50 Fed. Reg. 35, 184 (August 29, 1985) (PCBs are also toxic to mammals at very low exposure levels. The survival and reproductive success of fish can be adversely affected in the presence of PCBs. Various sublethal physiological

effects attributed to PCBs have been recorded in the literature"); 21 CFR § 500.

45(a) ("Since PCBs are toxic chemicals, the PCB contamination of food as a

result of these and other incidents represent a hazard to public health.").

30.     "For humans, exposure can cause acute effects such as skin rashes, vomiting,

abdominal pain, and temporary blindness and are suspected of causing birth defects,

miscarriages, and cancer." Rodgers & Burleson. *See also Solutia, Inc. v. McWane, Inc.*, 726 F.

Supp. 2d 1316, 1319 (N. D. Ala. 2010) ("PCBs have been found to cause cancer, decreased

fertility, still births, and birth defects in test animals. ") (Monsanto cleanup contribution case);

*Dickerson, Inc. v. United States*, 875 F.2d 1577, 1579, 1583 (11th Cir. 1989) ("PCBs are highly

toxic chemicals frequently used in electrical transformers... Scientists have found PCB

concentrations far below those involved in this case to cause cancer, decreased fertility, still

births, and birth defects in test animals.")

31.     The *Environmental Defense Fund* decision summarized research available to the

scientific community by the late 1970s:

> Polychlorinated biphenyls (PCBs) have been manufactured and
> used commercially for fifty years for their chemical stability, fire
> resistance, and electrical resistance properties. They are frequently
> used in electrical transformers and capacitors.
>
> However, PCBs are extremely toxic to humans and wildlife. The
> extent of their toxicity is made clear in the EPA Support Document
> accompanying the final regulations, in which the EPA Office of
> Toxic Substances identified several adverse effects resulting from
> human and wildlife exposure to PCBs.
>
> Epidemiological data and experiments on laboratory animals
> indicate that exposure to PCBs poses carcinogenic and other risks to
> humans. Experimental animals developed tumors after eating diets
> that included concentrations of PCBs as low as 100 parts per million
> (ppm). Experiments on monkeys indicate that diets with PCB
> concentrations of less than ten ppm reduce fertility and cause still
> births and birth defects. Other data show that PCBs may adversely

affect enzyme production, thereby interfering with the treatment of diseases in humans. Support Document, *supra* note 4. At 9-18.

EPA has found that PCBs will adversely affect wildlife as well as humans. Concentrations below one ppb (part per billion) are believed to impair reproductivity of aquatic invertebrates and fish. Some birds suffered "severe reproductive failure" when fed diets containing concentrations of only ten ppm of PCBs. *Id.* at 19. Because PCBs collect in waterways and bioaccumulate in fish, fish-eating mammals run a special risk of adverse effects. Such mammals may have "significantly higher concentrations of PCBs in their tissues than the aquatic forms they feed on."/rf. at 36.

EPA estimates that by 1975 up to 400 million pounds of PCBs had entered the environment. Approximately twenty-five to thirty percent of this amount is considered "free," meaning that it is a direct source of contamination for wildlife and humans. The rest, "mostly in the form of industrial waste and discarded end use products, is believed to be in landfill sites and thus constitutes a potential source of new free PCBs." *Id.* at 33-34. Other significant sources of PCBs include atmospheric fallout and spills associated with the use or transportation of PCBs. Id, at 29.

EPA concluded in the Support Document that "the additional release of PCBs" into the environment would result in widespread distribution of the PCBs and "will eventually expose large populations of wildlife and man to PCBs." *Id.* at 36-37 EPA concluded further that:

> As a practical matter, it is not possible to determine a "safe" level of exposure to these chemicals. Because PCBs are already widely distributed throughout the biosphere, they currently pose a significant risk to the health of man as well as that of numerous other living things. As a consequence, any further increase in levels of PCBs in the biosphere is deemed undesirable by EPA.

*Id.* at 38. Because "PCBs released anywhere into the environment will eventually enter the biosphere ... EPA has determined that any such release of PCBs must be considered ' significant."' *Id.*

In 1972, Monsanto, the major American manufacturer of PCBs, limited its sales of PCBs to manufacturers of transformers and capacitors. It ceased all manufacture of PCBs in 1977 and shipped the last of its inventory before the end of that year. Today, PCBs are produced in this country only as incidental byproducts of industrial

> chemical processes. There are no known natural sources of PCBs.
> *Id.* at 2.

*Environmental Defense Fund*, 636 F.2d at 1270-71. Most importantly, EPA expressly found that

any exposure of PCBs to the environment or humans could cause adverse effects. " *Id.* at 1283-

84.

32.    In the years following the ban, the EPA confirmed that PCBs are toxic, may cause

reproductive and developmental effects, and may cause tumors ("oncogenic potential") in people

exposed:

> *Health Effects.* EPA has determined that PCBs are toxic and
> persistent. PCBs can enter the body through the lungs,
> gastrointestinal tract, and skin, circulate throughout the body, and be
> stored in the fatty tissue.
>
> Available animal studies indicate an oncogenic potential, the degree
> to which would depend on exposure... Further epidemiological
> research is needed to correlate human and animal data, but EPA finds
> no evidence to suggest that the animal data would not predict an
> oncogenic potential in humans.
>
> In addition, EPA finds that PCBs may cause reproductive effects,
> developmental toxicity, and oncogenicity in humans exposed to
> PCBs. Available data show that some PCBs have the ability to alter
> reproductive processes in mammalian species, sometimes even at
> doses that do not cause other signs of toxicity. Animal data and
> limited available human data indicate that prenatal exposure to
> PCBs can result in various degrees of developmental toxic effects.
> Postnatal effects have been demonstrated in immature animals
> following exposure to PCBs prenatally and via breast milk.
>
> In some cases, chloracne may occur in humans exposed to PCBs.
> Severe cases of chloracne are painful and disfiguring, and symptoms
> may persist for an extended time...

50 Fed. Reg. 35182, 35183-84 (August 29, 1985).

33.    The EPA also determined that Monsanto's PCBs are probable human carcinogens.

In 1996, the EPA reassessed PCB carcinogenicity based on data related to Aroclors 1016, 1242,



gravel &
shea
A PROFESSIONAL CORPORATION
76 St. Paul Street
Post Office Box 369

1254, and 1260. The EPA's cancer reassessment was peer reviewed by experts on PCBs, including scientists from government, academia, and industry. U.S. EPA. PCBs: Cancer Dose-Response Assessment and Application to Environmental Mixtures (1996). U. S. EPA, Office of Research and Development, National Center for Environmental Assessment, EPA/600/P-96/001F (1996).

34.     This EPA report found that "[j]oint consideration of cancer studies and environmental processes leads to a conclusion that environmental PCB mixtures are highly likely to pose a risk for cancer to humans. " *Id.* at 57. In addition, "PCBs persist in the body, providing a continuing source of internal exposure after external exposure stops. There may be greater-than-proportional effects from less-than-lifetime exposure, especially for persistent mixtures and for early-life exposure." *Id.* at 57-59.  (Emphasis added.)

35.     The 1996 EPA report further noted that "PCBs also have significant ecological and human health effects other than cancer, including neurotoxicity, reproductive and developmental toxicity, immune system suppression, liver damage, skin irritation, and endocrine disruption.  Toxic effects have been observed from acute and chronic exposures to PCB mixtures with varying chlorine content. " *Id.* at vi.

36.     In 2000, the Agency for Toxic Substances and Disease Registry (ATSDR), issued a public health statement regarding PCB exposure. It noted that "[s]kin conditions, such as acne and rashes, may occur in people exposed to high level of PCBs... Some studies in workers suggest that exposure to PCBs may also cause irritation of the nose and lungs, gastrointestinal discomfort, changes in the blood and liver, and depression and fatigue." Agency for Toxic Substances and Disease Registry (ATSDR) 2000. Department of Health and Human Services, Public Health Service, at 4. The public health statement summarized experimental animal studies

gravel &
shea  A PROFESSIONAL CORPORATION
76 St. Paul Street
Post Office Box 369

- 10 -

finding liver damage, anemia, acne-like skin conditions, stomach injuries, thyroid injuries, kidney damage, impaired immune system function, behavioral alterations, endocrine disruption, and impaired reproduction. *Id.* at 5.

37.     PCB exposure poses higher risks for children and women. The 2000 ASTDR referenced studies which found consistent effects in PCB-exposed children: low birthweight, issues with motor skills, decreased short-term memory, and effects on the immune system. *Id.* at 6. The report highlighted that children are more vulnerable to PCB exposure than adults due to their smaller bodies and undeveloped brain, nervous, immune, endocrine, and reproductive systems. *Id.* Their lack of development makes PCB effects worse during the prenatal and neonatal periods. *Id.* Workplace exposure to PCBs can contaminate homes. The ATSDR statement reiterated that workplace PCB exposure can result in the worker's home becoming contaminated as well: "If you are exposed to PCBs in the workplace, it may be possible to carry them home from work... If this is the case, you should shower and change clothing before leaving work, and your work clothes should be kept separate from other clothes and laundered separately. " *Id.* at 7.

38.     PCB exposure causes neurodegenerative diseases. The ASTDR 2011 addendum reported that exposure to PCBs is particularly harmful for women, including higher incident rates of amyotrophic lateral sclerosis (ALS, also known as motor neuron disease), Parkinson's disease, and dementia. *Id.* at 4.

39.     PCB exposure results in neurobehavioral effects, such as learning deficits and anxiety, depression, and central nervous system effects. *Id.* at 5-6.

40.     PCBs elicit a broad range of toxic responses, including acute lethality, body weight loss, carcinogenesis, dermal toxicity, fatty liver, genotoxicity, hepatomegaly,

gravel &
shea

- 11 -

76 St Paul Street
Post Office Box 369

immunosuppressive effects, neurotoxicity, porphyria, reproductive and developmental toxicity, thymic atrophy, and thyroid hormone-level alterations. *Id.* at 39-40.

41.     PCBs also cause reproductive and developmental effects. "Reproductive function may be disrupted by exposure to PCBs, " and "neurobehavioral and development deficits have been reported in newborns exposed to PCBs in utero. " *Id.* at 45. Children born to women exposed to PCBs exhibited statistically significant decreased in gestational age, birth weight, and head circumference. *Id.* at 43. Higher levels of exposure to PCBs correlated with weaker reflexes, greater motor immaturity, and more pronounced startle responses. *Id.* at 43-44. As children exposed to PCBs age, they continue to have deficits in weight gain, slowed responsiveness, lower performance on visual recognition memory tests, lower IQs, lower reading comprehension, and lower attention spans. *Id.* at 44.

42.     Further, PCB exposure has been linked to reproductive effects in sperm shape and production and menstruation disruptions, resulting in difficulty or inability to conceive.

43.     PCB exposure causes endocrine and neurological adverse effects. "The epidemiological studies suggest a link between exposure to PCBs and thyroid hormone toxicity in humans. " *Id.* at 46. Adults exposed to PCBs have been shown to have significantly greater motor retardation; poorer results on certain memory and attention tests; and higher scores on standardized confusion scale than did control adults. *Id.* at 51.

44.     The Department of Health and Human Services and the Environmental Protection Agency "consider PCBs a probable human carcinogen." *Id.* at 51. In addition, and "on the basis of sufficient evidence of carcinogenicity in humans and experimental animals, the IARC [International Agency for Research on Cancer] classified PCBs are carcinogenic to humans." *Id.* PCB exposure has been linked to cancers of the liver, gallbladder, biliary tract, brain, stomach,

gravel &
shea  ....................

A PROFESSIONAL CORPORATION
76 St. Paul Street
Post Office Box 369

intestinal, thyroid, myeloma (cancer of plasma cells, which can damage bones, immune system, kidneys, and red blood cell count), non-Hodgkin lymphoma, and the skin, such as malignant melanomas. *Id.* at 48-50. In addition, "data from animal studies have shown that PCBs cause gastrointestinal tract tumors, hepatocarcinomas, leukemia, lymphomas, and pituitary tumors." *Id.* at 50.

45.     In a formal 2016 report, the IARC concluded, "There is *sufficient evidence* in humans for the carcinogenicity of polychlorinated biphenyls (PCBs). PCBs cause malignant melanoma. Positive associations have been observed for non-Hodgkin lymphoma and cancer of the breast... PCBs are *carcinogenic to humans*." International Agency for Research on Cancer. IARC monographs on the evaluation of carcinogenic risks to humans, volume 107, at 439. Polychlorinated and Polybrominated Biphenyls (2016) (emphasis in original).

## MONSANTO KNEW ABOUT THE DANGERS OF PCBS BUT CONTINUED TO MANUFACTURE AND PROMOTE THEM

46.     In the 1930s, Monsanto was well aware of scientific literature which established that inhalation of PCBs in industrial settings resulted in toxic systemic effects in humans. A 1937 Monsanto memorandum advised that "[e]xperimental work in animals shows that prolonged exposure to Aroclor vapors evolved at high temperatures or by repeated oral ingestion will lead to systemic toxic effects. Repeated bodily contact with the liquid Aroclors may lead to an acne-form skin emption." Markowitz & Rosner, *Monsanto, PCBs, and the creation of a "worldwide ecological problem,"* Journal of Public Health Policy (2018).

47.     In 1955, Monsanto's Medical Director, Dr. Emmet Kelly, summarized Monsanto's position on PCB toxicity: "We know Aroclors are toxic, but the actual limit has not been precisely defined. It does not make too much difference, it seems to me, because our main worry is what will happen if an individual develops any type of liver disease and gives history of

gravel &
shea  A PROFESSIONAL CORPORATION
76 St. Paul Street
Post Office Box 369

- 13 -

Aroclor exposure. I am sure the juries would not pay a great deal of attention to MACs [maximum allowable concentrates]." *Id.* at 14.

48.     The same year Dr. Kelly assured U.S. Steel Corporation in 1955 that Old Monsanto had tested Pydraul (one of Monsanto's PCB Aroclor products) and found that "exposures to large quantities of Pydraul F-9 for short periods of time . . . will not cause any toxic effects on the worker." However, these were false claims as Dr. Kelly and Monsanto had not conducted any research on long-term toxicity.

49.     In 1955, the Medical Department at the Aroclors Department in the Krummrich plant in St. Louis recommended that "the eating of lunches should not be allowed in this department." The reasoning was "Aroclor vapors and other process vapors could contaminate lunches unless they were properly protected. " *Id.*

50.     In addition, after noting that "the chance of contaminating hands and subsequently contaminating the food is a definite possibility, " the Medical Department stated that:

> It has long been the opinion the of Medical Department that eating in process departments is a potentially hazardous procedure that could lead to serious difficulties. While the Aroclors are not particularly hazardous from our own experience, this is a difficult problem to define because early literature work claimed that chlorinated biphenyls were quite toxic materials by ingestion or inhalation. In any case where a workman claimed physical harm from any contaminated food, it would be extremely difficult on the basis of past literature reports to counter such claims.

Garrett JT to Patrick HB, Krummrich Plant; "Department 246 (Aroclors)" (Nov 14, 1955).

51.     A 1957 internal Monsanto memorandum reported that, after conducting its own tests, the United States Navy decided against using Monsanto's Aroclors. The Navy had tested Pydraul on rabbits and found that skin applications had "caused death in all of the rabbits tested." They also found that "[t]he inhalation of 10 milligrams of Pydraul 150 per cubic meter or

approximately 2 tenths of a part of the Aroclor component per million for 24 hours a day for 50 days caused, statistically, definite liver damage." Dr. Kelly concluded, "No matter how we discussed the situation, it was impossible to change their thinking that [Aroclor-containing] Pydraul 150 is **just too toxic for use** in a submarine." Markowitz & Rosner at 15. (Emphasis added.)

52.     Four months after receiving the Navy's data, Elmer P. Wheeler, Assistant Director of the Medical Department, wrote to Standard Oil Company claiming that Pydraul 150 is "practically innocuous" when fed to rats and that in studies on rabbit skin and eyes it "was not more irritating than a 10% soap solution." These were blatantly false statements. In July 1965, Dr. Kelly made the same false statements to another Monsanto customer, E.I. DuPont de Nemours & Company. He failed to inform the customer of the Navy's research on the rabbits or any other studies that demonstrated toxicity in PCBs. Dr. Kelly even went so far as to say that Pydraul products certainly had no carcinogenic actions, despite Old Monsanto refraining from conducting any cancer studies on their products to corroborate such statements.

53.     Old Monsanto made another attempt in 1958 to downplay consumer complaints over its PCB goods. Socony Mobil had requested to use a label alerting its own clientele about Pydraul that was bought from Monsanto and sold for resale. The label would caution customers to "[a]void prolonged breathing of vapors or mists" on the label. In response, Old Monsanto's medical department wrote memo stating that it would be dangerous to use such language because was "not in the best interest of Pydraul sales" and giving such a warning could affect Old Monsanto's sales. Monsanto's Medical Director, Dr. Kelly, sent a letter to Socony Mobil objecting to any attempt to provide a "do not breathe fumes" instruction to Pydraul users. Dr.

gravel &
shea
A PROFESSIONAL CORPORATION
76 St. Paul Street
Post Office Box 369

- 15 -

Kelly told Socony Mobil that the warning was unsuitable for Old Monsanto's labelling, referencing false studies that claimed Pydraul was non-lethal to rats and rabbits.

54.    In March 1962, Dr. Kelly continued to lie about Aroclors, informing the U.S. Public Health Service in a letter that though significant inhalation of Arocolors could lead to liver problems, "[Old Monsanto's] experience and the experience of [Old Monsanto's] customers over a period of nearly 25 years, has been singularly free of difficulties."

55.    However, somehow Monsanto found it acceptable to continue selling and promoting PCBs in school construction projects across the country, including Twin Valley.

56.    Even with the growing evidence of the harm caused to living things by PCB contamination, Monsanto remained steadfast in its manufacturing, production, sale, marketing, and distribution of PCBs. Markowitz & Rosner at 23. As studies showing the ubiquitous presence of PCBs increased, Monsanto doubled down on denial, ignoring the widespread PCB contamination and subsequent harm that such exposure caused. For example, in 1966, an article titled "Report of a New Chemical Hazard" summarized a study conducted by Swedish chemist Søren Jensen at the Institution of Analytical Chemistry at Stockholm University. The study estimated that PCBs may be widely dispersed in environments because manufacturing interests are using them. Dr. Kelly had been made aware of this study and its implications, but nothing was done.

57.    Further, in 1968, the harmful effects of PCBs on peregrine falcons were shown in a Nature article titled, "Polychlorinated Biphenyls in the Global Ecosystem" by Dr. Richard Risebrough of the University of California.

58.    In March of 1969, Old Monsanto researcher W.R. Richard wrote a memorandum entitled "AROCLOR WILDLIFE ACCUSATIONS" to Monsanto Employee and Medical



gravel &
shea
A PROFESSIONAL CORPORATION
76 St Paul Street
Post Office Box 369

- 16 -

Director Elmer Wheeler. *Id.* at 27. In this memorandum, Richard responded to the 1968 Nature

article criticizing PCBs as being (in Richard's paraphrasing) "a pollutant... a toxic substance -

with no permissible allowable level... [and] a toxic substance endangering man himself, implying

that the [extinction] of the peregrine falcon is a leading indicator of things to come." Richard to

Wheeler Aroclor wildlife accusations. March 6, 1969. Richard also explained that Monsanto

could take steps to reduce PCB releases from its own factories, but he cautioned, "It will be still

more difficult to control other end uses such as cutting oils, adhesives, plastics, and NCR paper.

In these applications, exposure to consumers is greater and the disposal problem becomes

complex." *Id.*

59.    In 1969, W.R. Richard wrote a memorandum titled "Defense of Aroclor" which

admitted that PCBs will cause harm to living creature and the pace of Aroclor breakdown will be

slow. Richard, W.R. to Wheeler E. Defense of Aroclor-F. fluids. Sept 9, 1969. Shortly after it was

written, Old Monsanto established the "Aroclor Ad Hoc Committee" ("the Committee") in order

defend against the mounting proof of PCB toxicity and detrimental environmental effects.

60.    Though the Committee openly admitted the presence of widespread

contamination of PCBs in the general environment, it was only a front to maintain its sales. The

Committee's agenda was to: "1. Protect continued sales and profits of Aroclors; 2. Permit

continued development of new uses and sales; and 3. Protect the image of the Organic Division

and the Corporation as members of the business community recognizing their responsibilities to

prevent and/or control contamination of the global ecosystem." Wheeler EP. Monsanto. Minutes

of Aroclor Ad Hoc Committee, First Meeting (Sept 5, 1969).

61.    In October of 1969, the Committee drafted an internal memorandum that

demonstrated Old Monsanto's indifference over the harm their products were causing:

> The committee believes there is little probability that any action that can be taken [that] will prevent the growing incrimination of specific [PCBs] (the higher chlorinated — e.g. Aroclors 1254 and 1260) as nearly global environmental contaminants leading to contamination of human food (particularly fish), the killing of some marine species (shrimp), and the possible extinction of several species of fish-eating birds. There are, however, a number of actions which must be undertaken in order to prolong the manufacture, sale and use of these particular Aroclors as well as to protect the continued use of other members of the Aroclor series. Wheeler E.P. to Bergen HS. Jr. and Springate JE. Monsanto (Oct 2, 1969).

62.     Staying in line with the Committee's strategy, Old Monsanto not only

maintained its sales, but increased its production of Aroclors in 1969 and 1970, making

those years the largest volume manufacturing years in PCB history.

63.     In September of 1969, Richard wrote an interoffice memorandum entitled

"DEFENSE OF AROCLOR." Richard WR to Wheeler E. Defense of Aroclor-F. fluids. Sept 9,

1969. The memorandum set out Monsanto's general policy on defending litigation against the

public: "Make the Govt., States and Universities prove their case, but avoid as much

confrontation as possible." *Id.* The memorandum acknowledged that Monsanto

> can't defend vs. everything. Some animals or fish or insects will be harmed. Aroclor degradation rate will be slow. Tough to defend against. Higher chlorination compounds will be worse [than] lower chlorine compounds. Therefore we will have to restrict use and clean-up as much as we can, starting immediately.

*Id.* Based on this, Monsanto knew by the late 1960s that wildlife would be banned in the general

environment, where PCB contamination is low and diffuse - as opposed to PCB contamination in

a more enclosed space such as a classroom. The 1969 memorandum also outlined Monsanto's

plans for challenging scientific studies of the toxicity of PCBs. *Id.* It also outlined Monsanto's

own plans for chronic studies using animals. *Id.*

64.     In January of 1970, Elmer Wheeler of Monsanto's Medical Department circulated laboratory results of its own animal studies. The memorandum, made public recently, was entitled "Status of Aroclor Toxicological Studies". Wheeler E. Medical Department, to D.S. Cameron, Brussels "Status of Aroclor Toxicological Studies" (Jan 29, 1970). Wheeler stated, "Our interpretation is that the PCBs are exhibiting a greater degree of toxicity in this chronic study than we had anticipated. Secondly, although there are variations depending on species of animals, the PCB's are about the same as DDT in mammals." *Id.*

65.     Monsanto kept profiting from PCBs despite the research showing severe PCB toxicity. In the "PCB Presentation to Corporate Development Committee," Monsanto stated that "Do[ing] nothing was considered unacceptable from a legal, moral, customer & public relations & company policy viewpoint." Monsanto PCB Presentation to the Corporate Development Committee (April 1970). However, in Monsanto's eyes, stopping PCB production, promotion, and ending the Aroclor business "was considered unacceptable from a Divisional viewpoint... there is too much customer/market need and selfishly too much Monsanto profit to go out." *.Id.* at 8.

66.     Monsanto formed an internal Aroclor Ad Hoc Committee whose objective, "agreed to by the Committee," were to "submit recommendations for action which will: 1. Permit continued sales and profits of Aroclors and Terphenyls. 2. Permit continued development of uses and sales. 3. Protect image of Organic Division and of the Corporation." Wheeler EP. Monsanto. Minutes of Aroclor Ad Hoc committee, first meeting (Sept 5, 1969). Monsanto set these business objectives despite knowing that PCBs had been found in the environment, wildlife, and food chain, as PCBs "may be a global contaminant." *Id.* at 1. In these confidential minutes, Monsanto recognized the problem of PCBs "environmental contamination by

gravel &
shea  A PROFESSIONAL CORPORATION
76 St. Paul Street
Post Office Box 369

- 19 -

customers." *Id.* at 3 ("Our in-plant problems are very small vs. problems of dealing with environmental contamination by customers.").

67.     In October of 1969, Monsanto's Aroclor Ad Hoc Committee drafted and issued a confidential report that outlined the depths of the emerging crisis over PCBs. Wheeler EP to Bergen HS. Jr. and Springate JE. Monsanto (Oct 2, 1969). The committee reported environmental PCB contamination causing the killing of marine species and the possible extinction of several species of birds. *Id.* at 4. In addition, "the committee believes that there is no ~~possible~~ courses of action that can so effectively police the uses of these products as to prevent environmental contamination." *Id.* (underscore and strikethrough in original). The report outlined a plan to protect Monsanto's corporate interests: "There are, however, a number of ~~possible~~ actions which must be undertaken to prolong the manufacture, sale and use of these particular Aroclors as well as to protect the continued use of other members of the Aroclor series." *Id.* (underscore and strikethrough in original).

68.     The committee offered recommendations, including notifying PCB "customers of environmental contamination problems." *Id.* at 7. The basis for the recommendation, in part, concerned reports of PCB environmental contamination and Monsanto's knowledge of the mechanisms of PCB releases:

> It has been recognized from the beginning that other functional fluid uses could lead to losses of the Aroclors to liquid waste streams from the customers' plants. Losses could occur from spills, unusual leakage of large volumes and daily losses of smaller volumes.
>
> It has also been recognized that there could be vapor losses but it has been felt that these were perhaps of less significance than the vapor losses in plasticizer applications. The concern for vapor losses rises from the published proposed theory that even minute quantities of vapors are eventually transferred to the water environment and accumulated therein.

- 20 -

> Another possible source of air environmental contamination is the
> eventual destruction of materials which have Aroclors in them. Of
> particular significance might be the burning or partial incineration
> of waste or used products containing the Aroclors. *Id.*

69.     Despite the environmental damage caused by its PCB products, Monsanto was

clearly concerned about losing the production of PCBs and the associated "sales of this very

profitable series of compounds":

> The committee recognizes the restrictions placed on those currently
> involved by mandates to operate within nonnal or proposed reduced
> budgets. It should be clear, however, that the product groups, the
> Division, and the Corporation are faced with an extraordinary
> situation. There cannot be too much emphasis given to the threat of
> curtailment or outright discontinuance of the manufacture and sales
> of this very profitable series of compounds. If the products, the
> Division, and the Corporation are to be adequately protected,
> adequate funding is necessary.

*Id.* at 13.

70.     By 1970 the escape, fate, and transport of PCBs into surrounding environments

and resulting contamination and pollution was not only reasonably foreseeable to Monsanto, but

actually known to Monsanto.

71.     By 1970 Monsanto also knew that its PCBs exhibited a greater degree of toxicity,

accumulation, and persistence than Monsanto previously understood. Despite this knowledge,

Monsanto chose not to warn its customers or the public of the human health dangers of

Monsanto's PCBs, instead concealing the same. Monsanto's efforts were and continue to be to

focused on protecting its own profits.

72.     An internal secret Monsanto memorandum dated February 16, 1970, provided

excuses and active concealment techniques for any discussions outside the Company by any

Monsanto representatives with any PCB customers. Monsanto's N.T. Johnson circulated a

"Pollution Letter" to a large number of Monsanto employees, in which Monsanto's justification

for its subterfuge was that Monsanto "can't afford to lose one dollar of business." *Id.* at 2. To that end, Monsanto stated:

> We want to avoid any situation where a customer wants to return
> fluid... We would prefer that the customer use up his current
> inventory and purchase [new products] when available. He will then
> top off with the new fluid and eventually all Aroclor 1254 and
> Aroclor 1260 will be out of his system. We don't want to take fluid
> back...

*Id.* at 1. Monsanto put revenue and profits way ahead of human health and environmental safety.

73.     Monsanto went so far as to send this diversionary message to a member of
Congress and advised public officials that Monsanto's "PCBs are not used in some of the
applications which have been indicated in the public press." Elmer Wheeler to W.R. Richard
(May 26, 1969). Monsanto expressed its views to the public, stating: "We cannot conceive how
the PCBs can be getting into the environment in a widespread fashion and the company is
actively involved in research programs to try to shed some light on the situation." *Id.* at 2. This
was a lie.

74.     For decades prior, Monsanto's knowledge of PCB toxicity grew. Despite its
knowledge of PCB toxicity, Monsanto intentionally produced and promoted PCBs "for use in a
wide range of industrial and household goods, including electrical equipment, paint, sealants,
food cookers, furnaces, floor wax, insecticides, lubricants, moisture-proof coatings, papers,
asphalt, leather adhesive, and stucco." *City of Seattle v. Monsanto Co.*, 237 F. Supp. 3d 1096,
1100 (W.D. Wash. 2017).

75.     "Though Monsanto was aware of PCB's toxicity and propensity to leach, it denied
or misrepresented those facts to government investigators. Monsanto continued to manufacture.
promote, and profit from its PCBs. " *Id.* (holding that Seattle's claims against Monsanto for



gravel &
shea
A PROFESSIONAL CORPORATION
76 St. Paul Street
Post Office Box 369

- 22 -

public nuisance are not preempted - rejecting Monsanto's argument that intervening acts of third parties cut off proximate causation, because such acts were foreseeable by Monsanto).

76.     Monsanto intentionally failed to warn customers and the public regarding the toxicity and hazards of its PCB products. *Nevada Power Co. vs. Monsanto Co.*, 955 F.2d 1304, 1306-07 (9th Cir. 1992) ("Nevada Power discovered internal documents of the Manufacturers which Nevada Power contends to show that the Manufacturer's understanding of the dangers of PCBs in the 1960s and early 1970s was much more advanced than the general state of knowledge in the scientific community").

77.     Monsanto's PCBs were not reasonably safe for use in school construction because they were unsafe—"extremely toxic"—to an extent beyond that which would be contemplated by an ordinary consumer. The toxicity of Monsanto's PCBs was a proximate cause of Kristy's damages.

78.     Monsanto's PCBs were an unavoidably unsafe product, which was a proximate cause of Kristy damages, reasonably foreseeable to Defendants.

79.     Monsanto warnings to the non-Monsanto parties in this case at the time of manufacture regarding the extreme toxicity of PCBs, were inadequate and a proximate cause of Plaintiff's damages.

80.     Monsanto warnings to pertinent non-Monsanto entities or persons in this case after manufacture—and up to present day—regarding the toxicity of Monsanto's PCBs have been inadequate, which was a proximate cause of Kristy's damages.

81.     Due to their toxicity, Monsanto's PCBs never had a "useful safe life."

82.     Monsanto had actual and/or constructive knowledge of the defect and the danger
of its PCBs but showed indifference or conscious disregard for the safety of others by producing
and promoting PCBs.

## OLD MONSANTO PROMOTED THE USE OF ITS TOXIC PCBS TO CONSTRUCT BUILDINGS BEFORE 1980, INCLUDING THE CONSTRUCTION OF SCHOOL BUILDINGS

83.     Unfortunately for Plaintiff, Monsanto's campaign of deception was a success.
Monsanto sold PCB-containing products to customers who then used them in building materials
and electrical equipment in construction up to the 1980s. Studies show that PCB contamination
is widespread as a result. A study in the Journal of Environmental Health Perspectives found that
54% of the buildings tested in Boston that were constructed or renovated in the 1970s tested
positive for PCBs, with concentrations ranging from 0.56–32,600 parts per million (PPM).
Another study of buildings renovated or constructed in San Francisco found that 88% of samples
taken were positive for PCBs, with concentrations ranging between 1–220,000 PPM. These
studies demonstrate that PCBs contamination in older buildings is widespread in the United
States and has exposed millions of Americans, including the Plaintiff, to Monsanto's toxic PCB
products.

84.     Schools renovated or built before 1980 are more likely to have PCBs in their
building materials, typically as plasticizers in caulking, paints, ballasts, sealants, electrical
transformers, lighting ballasts, and other applications in the construction of schoolhouses,
including the construction of Twin Valley in Wilmington, Vermont, and other facilities. In these
forms, Monsanto's PCBs were used in interior and exterior windows, doors, and masonry joints.

85.     According to the EPA, even today, caulk containing high PCB levels is still prevalent in school buildings. Thomas, "PCBs in school buildings: sensible steps to healthier school environments," U. S. EPA Office of Research and Development (2014).

86.     PCB-caulking emits PCBs into the ambient air in school buildings, which migrate into the air and nearby materials, including adjoining wood, cement, and brick air and dust inside schools; soil near school buildings; and other materials and furnishings; and into the bodies of men, women, and children in the buildings, including the Plaintiff. *Id.* Similarly, PCB electrical transmitters and lighting ballasts emit PCBs into the ambient air in school buildings, which migrate into the air and nearby materials, including adjoining wood, cement, and brick; air and dust inside schools; soil near school buildings; and other materials and furnishings; and into the bodies of men, women, and children in the buildings, including the Kristy.

87.     As stated by the EPA, PCB-caulking and other sealants in school buildings can create indoor air levels above recommended concentrations. In addition, "high PCB levels remain and emissions will continue far into the future." *Id.*

88.     Monsanto's PCBs were also produced and promoted at components of electrical equipment such as transformers, motor start capacitors, and lighting ballasts.

89.     "Commercial PCB mixtures vary from colorless to dark brown oils, and from viscous liquids to sticky resinous semisolids. Although PCBs evaporate slowly at room temperature, the volatility of PCBs increases dramatically with even a small rise in temperature. Equipment that contains PCBs can overheat and vaporize significant quantities of these compounds, creating an inhalation hazard that can be magnified by poor ventilation." (ATSDR, 2014) at 25.


gravel &
shea
A PROFESSIONAL CORPORATION
76 St. Paul Street
Post Office Box 369

- 25 -

90.     In schools located in the northeastern United States, nearly one-in-five interior

caulk/sealant samples had PCBs of greater than 50 ppm, with 6% greater than 100,000 ppm. *Id.*

Further, PCB-containing light ballasts were manufactured until the late 1970s. Anywhere from

24%-95% of the light ballasts in northeastern schools likely contained PCBs. The "failure and

release of PCBs will continue and may increase" in school buildings containing PCB-light

ballasts. *Id.* PCBs are continuously released into the air from intact, functioning light ballasts. *Id.*

at 11. PCB ballasts can fail, releasing PCB vapors into the air and liquid PCBs onto surfaces. *Id.*

"Residues from previously failed ballasts can remain in light fixtures even if the ballast is

replaced." *Id.*

91.     There are also extremely toxic chemical byproducts of PCB-ballasts such as

dioxins and furans. Failing PCB-ballasts that pyrolyze their PCB contents generate and emit

additional toxic chemicals called polychlorinated dibenzodioxins and polychlorinated

dibenzofurans. 50 Fed. Reg. 29, 171 (July 17, 1985); *Ahrens v. Pacific Gas & Electric Co.*, 197

Cal. App. 3d 1134, 1139, n. 2 (1988).

92.     Gradually over time, school building materials become secondary sources of PCB

contamination after absorbing PCBs emitted from the primary contamination sources. EPA

(2014) at 12. The EPA even noted that in some cases, secondary sources "may need to be

considered for additional remedial actions following removal/remediation of primary sources."

*Id.*

93.     For these reasons and others, Monsanto knew or should have known that PCBs

were unsafe for use in schools. Monsanto made no efforts to warn any schools, including Twin

Valley, the parents of Twin Valley schoolchildren, or the teachers and staff at Twin Valley.

94.     Monsanto's PCBs were not reasonably safe for use in school construction because they were extremely toxic to an extent beyond that which would be contemplated by an ordinary consumer. The toxicity of Monsanto's PCBs is a proximate cause of Kristy's damages. When a reasonably careful manufacturer learns that its product is toxic and poses a danger to public health, the manufacturer must stop producing and selling the product and issue an immediate recall, take remedial measures, such as abatement, and/or warn the public about the product. This is especially the case when a manufacturer knows or reasonably should know that its toxic products are in schoolhouses, libraries, and other public facilities.

95.     Despite knowing about PCB toxicity and the danger to public health and the environment and/or of schoolhouse applications, Monsanto did not take the responsible measures outlined in the foregoing paragraph. Instead, Monsanto continued to promote and profit from its sale and manufacture of toxic PCBs and actively concealed from the public the toxic nature of PCBs, and their ubiquitous presence even in schoolhouses. The only measures that Monsanto took were to destroy incriminating documents, conceal the truth from the public, deploy hundreds of lawyers to assist it in its concealment strategies, and disengage its own employees from any responsibilities or duties with regard to PCBs.

96.     Monsanto recently acknowledged that toxic PCB pollution is widespread throughout the United States. In June 2020, Monsanto agreed to pay $550 million into a common fund to be distributed to over 2,000 class members across the United States. The class members included different cities alleging that Monsanto's design, manufacture, sale, promotion, and supply of PCBs resulted in the contamination of stormwater and other resources. Monsanto thus acknowledged that it was responsible for PCBs in stormwater throughout the United States regardless of the immediate source of the PCBs.



gravel &
  shea
A PROFESSIONAL CORPORATION
76 St Paul Street
Post Office Box 369

- 27 -

97.     Additionally, Washington state court cases have resulted in jury verdicts against Monsanto for schoolteachers who alleged neurological and physical injuries caused by exposure to PCBs within schools. Monsanto continues to fight against these and other schoolteachers and schoolchildren who have been exposed to Monsanto's PCBs in schoolhouses.

## MONSANTO'S PCBS CONTAMINATE VERMONT SCHOOLS INCLUDING TWIN VALLEY

98.     Vermont schools are not exempt from PCB exposure. PCB contamination has affected several Vermont schools, including Twin Valley which Kristy attended.

99.     Similar to other schools in the United States, buildings constructed before 1980 in Vermont contained PCBs in their building materials and electrical equipment. As specified by the EPA, "occupants in schools with interior PCB sources will be exposed to PCBs in the indoor air, dust, and on surfaces through their normal activities." For Kristy and others in such school buildings, "exposures will occur through inhalation, ingestion, and dermal contact." EPA (2014) at 16.

100.    Vermont has been so affected by Monsanto's toxic PCBs that in 2021, the Vermont Legislature passed Act 74 which required that all schools constructed or renovated before 1980 test their indoor air for PCBs. The testing began in spring 2022 and is expected to be completed by 2025. Several schools, including Kristy's school, Twin Valley in Wilmington, recorded high levels of PCB contamination.

101.    In 2023, Twin Valley found highly elevated PCB levels in multiple classrooms, facilities, the library, and gymnasium. Due to the confirmed presence of PCBs at Twin Valley, the Twin Valley principal claimed that the school has paid more than $18,000 for the air filters to

gravel &
shea
A PROFESSIONAL CORPORATION
76 St. Paul Street
Post Office Box 369

- 28 -

attempt to limit children's exposure to PCBs.[1] However, their attempts to reduce exposure

inadvertently resulted in increased PCB levels. Unable to remedy the situation swiftly, Twin

Valley closed several areas of their campus utilized by students and was forced to find new

spaces for classes and activities that previously utilized the now unavailable toxic facilities.

Several Twin Valley classrooms, as well as the library, and the gymnasium remain closed for

student-use at the time of filing.

102.    The Vermont Agency of Natural Resources requires schools to act if testing is

higher than 30 ng/m3 for pre-kindergarten, 60 ng/m3 for kindergarten through 6th grade, 100

ng/m3 for 7th grade through adult.[2] Twin Valley's results were nowhere near passable:

---

[1] Alison Novak, *A PCB 'Fix' at Wilmington School Actually Drives Levels Higher*, SEVEN DAYS (May 1, 2023), https://www.sevendaysvt.com/news/a-pcb-fix-at-wilmington-school-actually-drives-levels-higher-38135302 (last visited 12/12/2023).

[2] PCB (vt.gov) (last visited 11/08/2023)

gravel &
shea    ···········

- 29 -

| | Sample ID | Room | Youngest Grade Of Occupants | Room Sampled | Result | Analysis Date |
|---|---|---|---|---|---|---|
| View Sample | 5121_Gym Stage | Gym Stage | Pre-Kindergarten | Yes | 410.00 | 03/16/2023 |
| View Sample | 5121_Kitchen | Kitchen | Adult/Staff | Yes | 65.00 | 03/15/2023 |
| View Sample | 5121_Gentlemen bathroom | Gentlemen bathroom | Pre-Kindergarten | Yes | 68.00 | 03/15/2023 |
| View Sample | 5121_Entry hallway | Entry hallway | Pre-Kindergarten | Yes | 56.00 | 03/15/2023 |
| View Sample | 5121_154 | 154 | Adult/Staff | Yes | 450.00 | 03/16/2023 |
| View Sample | 5121_190 | 190 | Adult/Staff | Yes | 99.00 | 03/16/2023 |
| View Sample | 5121_Boiler Room | Boiler Room | Adult/Staff | Yes | 830.00 | 03/16/2023 |
| View Sample | 5121_111 | 111 | Pre-Kindergarten | Yes | 36.00 | 03/15/2023 |
| View Sample | 5121_119 | 119 | Kindergarten | Yes | 20.00 | 03/15/2023 |
| View Sample | 5121_122 | 122 | 2nd Grade | Yes | 13.00 | 03/15/2023 |
| View Sample | 5121_127 | 127 | 2nd Grade | Yes | 24.00 | 03/16/2023 |
| View Sample | 5121_141 | 141 | Pre-Kindergarten | Yes | 90.00 | 03/16/2023 |
| View Sample | 5121_148 | 148 | Adult/Staff | Yes | ND | 03/16/2023 |
| View Sample | 5121_156 | 156 | Kindergarten | Yes | 370.00 | 03/16/2023 |
| View Sample | 5121_161 | 161 | Kindergarten | Yes | 11.00 | 03/16/2023 |

| | Sample ID | Room | Youngest Grade Of Occupants | Room Sampled | Result | Analysis Date |
|---|---|---|---|---|---|---|
| View Sample | 5121_162 | 162 | 3rd Grade | Yes | 6.70 | 03/16/2023 |
| View Sample | 5121_168 | 168 | 3rd Grade | Yes | 46.00 | 03/16/2023 |
| View Sample | 5121_Gym - library Hallway | Gym - library Hallway | 3rd Grade | Yes | 580.00 | 03/17/2023 |
| View Sample | 5121_Nurse Bathroom | Nurse Bathroom | Pre-Kindergarten | Yes | 77.00 | 03/16/2023 |
| View Sample | 5121_West hallway | West hallway | Pre-Kindergarten | Yes | 36.00 | 03/16/2023 |
| View Sample | 5121_Gym Storage | Gym Storage | Adult/Staff | Yes | 150.00 | 03/17/2023 |
| View Sample | 5121-132-Dup1 | 132 | Pre-Kindergarten | Yes | 570.00 | 03/17/2023 |
| View Sample | 5121-156-Dup2 | 156 | Kindergarten | Yes | 400.00 | 03/17/2023 |
| View Sample | 5121_Ambient | Outside | | Yes | ND | 03/16/2023 |
| View Sample | 5121_FieldBlank | Field Blank | | Yes | ND | 03/16/2023 |
| View Sample | 5121_132 | 132 | Pre-Kindergarten | Yes | 470.00 | 03/16/2023 |

1  **2**



gravel & shea
ATTORNEYS AT LAW

A PROFESSIONAL CORPORATION
76 St. Paul Street
Post Office Box 369

103.    Vermont requires immediate closure when levels exceed the immediate action levels:

> Since these levels pose a greater exposure risk, rooms that are at or above these levels plus any untested 2 rooms in a group with one or more rooms at or above the immediate action level cannot be used. The Vermont Immediate Action Levels are:
>
> • 90 ng/m3 for pre-kindergarten
>
> • 180 ng/m3 for kindergarten through 6th grade
>
> • 300 ng/m3 for 7th grade through adult

104.    Twin Valley exhibits extremely high PCBs levels with several rooms doubling and tripling even the higher "immediate action levels" standards, while testing above "action levels" in a dozen more rooms and spaces.

105.    Given what we know today about PCBs, and what Defendants knew for decades, it is now apparent that Twin Valley has exhibited similar, the same, or higher levels of PCBs since its erection because PCBs degrade extremely slowly and continue to contaminate and render toxic school buildings and facilities more than half a century after PCBs were banned.

106.    Further, not all rooms at Twin Valley were tested and there are likely more rooms that have had immediate action levels since Twin Valley was constructed.

107.    The public, staff, parents, and children—including Kristy—were unaware of the actual toxic contamination of PCBs within the school buildings at Twin Valley until officials from the state's education, health and natural resources agencies held a forum with Twin Valley parents on April 3, 2023, and the principal sent a letter outlining the issues to parents on April 5, 2023.[3] This was the first time that Kristy heard that Monsanto's conduct caused her injuries.

---

[3] PCBs Contamination Closes Library, Gym at Twin Valley Elementary | Education | Seven Days | Vermont's Independent Voice (sevendaysvt.com) (last visited 11/08/2023)



gravel &
shea
A PROFESSIONAL CORPORATION
76 St. Paul Street
Post Office Box 369

- 31 -

## PCB EXPOSURE AT TWIN VALLEY CAUSED KRISTY'S INJURIES

108.    Kristy attended Twin Valley beginning pre—kindergarten in 1982 all the way until end of 6th grade in 1990. Kristy further returned for a one-year internship at Twin Valley in 1996. Kristy spent a total of nine years being exposed to Monsanto's toxic PCBs, the vast majority of which were at a very young age when Kristy was most susceptible to PCB toxicity and carcinogenic effects. As proximate contributory cause of Defendants' wrongful and tortious conduct, Plaintiff was exposed to toxic PCBs during her attendance of Twin Valley Elementary School, and suffered adverse medical consequences, including, but not limited to, fast growing b-cell lymphoma – also known as a type of Non-Hodgkin Lymphoma – reproductive issues, personal injuries, and emotional distress.

109.    In 2022, Kristy developed symptoms and was diagnosed with fast growing b-cell lymphoma, a type of Non-Hodgkin Lymphoma. 45-year-old Kristy has no family history of this cancer and does not fall into any of the increased risk categories. Plaintiff's long-term exposure to Defendants' PCB-products in her elementary school left her unknowingly susceptible to the toxic properties of the products. This exposure to PCBs directly contributed to the occurrence of her current condition.

110.    Kristy suffered and continues to suffer the burdens of cancer, chemotherapy, and the high price tags associated with cancer treatment and monitoring, all caused by the exposure to Defendants toxic PCBs.

111.    Monsanto did not warn Kristy or others of the toxicity and presence of PCBs as a public health hazard in schoolhouses, at Twin Valley, or the environment.

112.    Monsanto failed to issue any public warnings, notices, or information that PCBs are present in schoolhouses and are extremely toxic and threaten public health. Information


gravel &
shea
A PROFESSIONAL CORPORATION
76 St. Paul Street
Post Office Box 369

- 32 -

provided by Monsanto during or after manufacture of PCBs has been inadequate and or false and misleading.

113.     Monsanto's PCBs have contaminated schools in Vermont, including Twin Valley, causing harm to the children, students, teachers, staff members, contractors, occupants, and others of the school, including Kristy. This was not only reasonably foreseeable, but it was known to Monsanto knew that such harm would occur to third parties such as Kristy. Accordingly, Kristy seeks compensatory and punitive damages against Monsanto.

114.     It was also reasonably foreseeable, based on Monsanto's history and experience with PCB customers and users, that some inspectors, owners, operators, providers, or maintainers of buildings would engage in negligent conduct that would result in harm to innocent third parties, such as teachers and schoolchildren, including Kristy, by exposing them to Monsanto's PCBs.

115.     All of Kristy's injuries and damages are due to, caused by, and or a substantial factor of exposure to PCBs at Twin Valley, with Defendants jointly, severally, and independently responsible and liable for the same.

## COUNT I
### Strict Liability – Design Defect

112.     Plaintiff re-alleges and incorporates by reference the preceding allegations as though set forth fully herein.

113.     Defendants designed, manufactured, marketed, distributed, and sold PCBs and PCB-containing products.

114.     As designers, manufacturers, marketers, distributors, and sellers of PCBs and PCB containing products, Defendants owed a duty to all persons at risk of foreseeable harm from

gravel &
shea   A PROFESSIONAL CORPORATION

- 33 -

76 St. Paul Street
Post Office Box 369

PCBs, including Kristy, to not market any PCB product which is unreasonably dangerous for its intended and foreseeable uses.

115.    Defendants represented, asserted, claimed, and warranted that their PCBs and PCB containing products were safe for their intended and foreseeable uses, including at Twin Valley.

116.    When Defendants or their predecessors placed their PCBs and PCB-containing products into the stream of commerce, they were defective, unreasonably dangerous, and not reasonably suited for their intended, foreseeable, and ordinary storage, handling, and usage, including for construction purposes at Twin Valley.

117.    Defendants knew that PCBs would escape and poison the occupants of Twin Valley because Defendants knew that:

      a.    PCBs escape their applications, including construction materials, to contaminate indoor air and surfaces in buildings using PCB-containing construction materials through the normal and foreseen use of PCBs and PCB-containing products.

      b.    PCBs accumulate and persist over time in indoor spaces after volatilizing or off gassing from construction materials used in build.

      c.    PCBs persist over long periods of time because PCBs are resistant to biodegradation and bioremediation.

      d.    PCBs bioaccumulate in humans.

      e.    PCBs pose risks to human health.

      f.    The risks that PCBs pose to Vermont schools, like Twin Valley, outweigh the utility of incorporating PCBs into product formulations, including in



gravel &
shea A PROFESSIONAL CORPORATION
76 St. Paul Street
Post Office Box 369

> paper products, plastics, resins, adhesives, inks, varnishes, construction
> materials, and electrical equipment.
>
> g.    Safer alternatives to PCBs have existed and been available to Defendants
> or their predecessors at all times relevant to this litigation.
>
> h.    Defendants had knowledge of these risks and failed to use reasonable care
> in the design of PCBs and PCB-containing products.

118.    A reasonable company with the above outlined knowledge of the potential of
PCBs to cause injuries to human beings would conclude that they should not have been
manufactured, distributed, marketed, promoted, and sold as a product, component for a product,
or for the products in which they were incorporated.

119.    A reasonable company who had knowledge that PCBs cannot be contained would
conclude that they should not have been manufactured, distributed, marketed, promoted, and or
sold.

120.    Despite Defendants' knowledge of PCB health hazards, Defendants intentionally
sold, promoted, and distributed the PCBs and PCB-containing products in the manner reasonably
foreseen, or as should have been reasonably foreseen by the Defendants, in order to maximize its
profits with complete disregard of guaranteed injuries to human beings.

121.    The above defects exceeded the knowledge of the ordinary person and by the
exercise of reasonable care, Plaintiff would not be able to avoid the harm caused by PCBs at
Twin Valley.

122.    Twin Valley, and many other Vermont Schools, are and have been contaminated
with dangerous PCBs as a direct result of Defendants' conduct since construction.



gravel &
  shea    ...............

A FROTT MORAT CORPORATION
76 St. Paul Street
Post Office Box 369

- 35 -

123.    Plaintiff has incurred and will continue to incur costs and expenses to monitor and heal the damages caused to her health, including but not limited to Non-Hodgkin Lymphoma, due to exposure to Defendants' toxic PCBs for which Defendants are strictly, jointly, and severally liable.

124.    As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and continues to suffer monetary damages to be proven at trial.

125.    Defendants continue to cause harm in Vermont and across the country by failing to remediate its toxic PCBs.

## COUNT II
### Strict Liability – Failure To Warn

126.    Plaintiff re-alleges and incorporates by reference the preceding allegations as though set forth fully herein.

127.    Defendants designed, manufactured, marketed, distributed, and sold PCBs and PCB-containing products.

128.    As designers, manufacturers, marketers, distributors, and sellers of PCBs and PCB containing products, Defendants owed a duty to all persons at risk of foreseeable harm from PCBs, including Kristy, to issue adequate warnings and instructions to prevent, avoid, or otherwise eliminate unreasonable risks of harm to person and property, including at Twin Valley, arising from PCBs.

129.    Defendants knew that their PCBs and PCB-containing products would be purchased and implemented into Twin Valley construction without notice of the hazards which PCBs will pose to occupants, including Kristy.

130.    Defendants' failure to warn of these hazards made their PCBs and PCB-containing products unreasonably dangerous.

131.    At all times relevant to this litigation, Defendants had actual and or constructive

knowledge of facts, including the following, which rendered their PCBs and PCB-containing

products hazardous to Plaintiff and other occupants of Vermont schools.

> a.    PCBs escape their applications, including construction materials, to
>       contaminate indoor air and surfaces in buildings using PCB-containing
>       construction materials through the normal and foreseen use of PCBs and
>       PCB-containing products.
>
> b.    PCBs accumulate and persist over time in indoor spaces after volatilizing
>       or off gassing from construction materials used in build.
>
> c.    PCBs persist over long periods of time because PCBs are resistant to
>       biodegradation and bioremediation.
>
> d.    PCBs bioaccumulate in humans.
>
> e.    PCBs pose risks to human health.
>
> f.    The risks that PCBs pose to Vermont schools, like Twin Valley, outweigh
>       the utility of incorporating PCBs into product formulations, including in
>       paper products, plastics, resins, adhesives, inks, varnishes, construction
>       materials, and electrical equipment.
>
> g.    Safer alternatives to PCBs have existed and been available to Defendants
>       or their predecessors at all times relevant to this litigation.
>
> h.    Defendants had knowledge of these risks and failed to use reasonable care
>       in the design of PCBs and PCB-containing products.

132.    The foregoing facts relating to the hazards that PCBs pose to Kristy and other

occupants of PCB contaminated buildings, including schools like Twin Valley, are not the sort of

facts that, at the relevant times, Kristy could have ordinarily discovered or protected herself against absent sufficient warnings and instructions.

133.    Defendants or their predecessors breached their duty to warn by unreasonably failing to provide warnings concerning any of the facts alleged here to Plaintiff, Vermont schools, public officials, consumers, and or the general public.

134.    Defendants further breached their duty to warn by unreasonably failing to provide adequate instructions concerning steps to be taken to prevent, avoid, or otherwise eliminate unreasonable risks of harm to person and property, including the environment, arising from PCBs and PCB-containing products ultimately resulting in dangerously high levels of PCB exposure for Kristy at Twin Valley.

135.    Defendants' failure to warn proximately caused reasonably foreseeable injuries to Kristy.

136.    A reasonable company who had knowledge of the potential of PCBs to be unable to be contained would conclude that they should, refrain from producing and selling PCBs, or at least provide adequate notice and warning to prevent, avoid, or otherwise eliminate unreasonable risks of harm to persons like Kristy.

137.    Defendants intentionally sold, promoted, and distributed the PCBs and PCB containing products in the manner reasonably foreseen, or as should have been reasonably foreseen by the Defendants without any warning or notice despite the knowledge of health hazards in order to maximize its profits regardless of guaranteed injuries to human beings.

138.    Kristy and others would have heeded legally adequate warnings and instructions if such were present.


gravel &
shea
A PROFESSIONAL CORPORATION
76 St Paul Street
Post Office Box 369

- 38 -

139.    The above defects exceeded the knowledge of the ordinary person and by the exercise of reasonable care, Kristy would not be able to avoid the harm caused by PCBs at Twin Valley absent warning.

140.    Twin Valley, and many other Vermont Schools, are contaminated with dangerous PCBs as a direct result of Defendants conduct.

141.    Kristy has incurred and will continue to incur costs and expenses to monitor and heal the damages caused to her health, including but not limited to Non-Hodgkin Lymphoma, due to exposure to Defendants toxic PCBs for which Defendants are strictly, jointly, and severally liable.

142.    As a direct and proximate result of Defendants' conduct and failure to warn, Plaintiff has suffered and continues to suffer monetary damages to be proven at trial.

143.    Defendants continue to cause harm in Vermont and across the country by failing to remediate its toxic PCBs.

## COUNT III
### Negligence

144.    Plaintiff re-alleges and incorporates by reference the preceding allegations as though set forth fully herein.

145.    Defendants owed Kristy a duty of reasonable care.

146.    Defendants negligently breached that duty of reasonable care by manufacturing, marketing, labelling, packaging, and distributing its PCBs and PCB containing products that are dangerous and hazardous to the public, including Kristy, when used ordinarily and as intended in construction, such as at Twin Valley, and a multitude of other applications.

147.    As described above, for approximately half a century, Defendants were aware of the hazards of PCBs, and either knew or should have known that its PCBs would be released into



gravel &
shea
A PROFESSIONAL CORPORATION
76 St. Paul Street
Post Office Box 369

- 39 -

the environment or absorbed within an enclosed system such as a school building and its occupants.

148. Despite this actual and constructive knowledge, Defendants continued to market and sell its PCBs aggressively. Defendants' ongoing negligence caused, legally caused, and or contributed to cause:

     a.    PCB contamination at Twin Valley;

     b.    Kristy's prolonged exposure to PCBs at Twin Valley;

     c.    The accumulation of PCBs in Kristy's body;

     d.    Plaintiff's personal injuries, including but not limited to Non-Hodgkin Lymphoma;

     e.    Severe emotional distress; and

     f.    Economic and non-economic damages.

149. As a direct and proximate result of Defendants' conduct, Kristy has suffered and continues to suffer monetary damages to be proven at trial.

150. Defendants' conduct was willful, wanton, grossly negligent, and or in reckless disregard for the Kristy's rights, thereby justifying an award of punitive damages against the Defendants.

## COUNT IV
### Failure to Warn

151. Plaintiff re-alleges and incorporates by reference the preceding allegations as though set forth fully herein.

152. Plaintiff alleges that Defendants' knowledge of the dangers inherent in PCBs at the time Defendants manufactured and sold PCBs created a non-delegable duty to warn Kristy, the public, and Defendants' own customers.



76 St. Paul Street
Post Office Box 369

153.     Defendants knew or should have known that PCBs were dangerous to an extent
beyond which would be contemplated by an ordinary consumer and or innocent children and
schoolteachers.

154.     Despite this actual knowledge of the inherent dangers of its products. Defendants
have made no attempts to warn the public, Kristy, or Twin Valley of the health hazards and
toxicity of PCBs.

155.     To the contrary, Defendants have taken every means possible to attack the
science, undermine the science, ignore the EPA's findings on PCBs, conceal the hazardous nature
of PCBs from the public, prolong its manufacture and profit from selling toxic PCBs, and
allowed innocent children, including Kristy, and schoolteachers to be exposed to toxic PCBs in
school facilities, including Twin Valley, all to benefit Defendants' bottom-line.

156.     A reasonable company who had knowledge of the toxicity of PCBs and the
inability of containment of PCBs, would conclude that they should refrain from producing and
selling PCBs, or at least provide adequate notice and warning to prevent, avoid, or otherwise
mitigate unreasonable risks of harm to persons like Kristy.

157.     For the reasons above, Defendants' failures to warn constitute negligent failure to
warn. Moreover, Defendants' failures to warn render Defendants' PCB products defective in their
representation, sales, distribution, and permitted uses.

158.     Defendants' negligent failure to warn caused, legally caused, and or contributed to
cause:

> a.      PCB contamination at Twin Valley;
>
> b.      Kristy's exposure to PCBs at Twin Valley;
>
> c.      The accumulation of PCBs in Kristy's body;


gravel &
shea
A PROFESSIONAL CORPORATION
76 St. Paul Street
Post Office Box 369

   d.  Kristy's personal injuries, including but not limited to Non-Hodgkin
     Lymphoma;

   e.  Severe emotional distress; and

   f.  Economic and non-economic damages.

  159. As a direct and proximate result of Defendants' conduct, Kristy has suffered and
continues to suffer monetary damages to be proven at trial.

  160. Defendants' conduct was willful, wanton, grossly negligent, and or in reckless
disregard for Kristy's rights, thereby justifying an award of punitive damages against the
Defendants.

## COUNT V
## Misrepresentation

  161. Plaintiff re-alleges and incorporates by reference the preceding allegations as
though set forth fully herein.

  162. Defendants were aware of the hazards, risks, and fate and transport of PCBs, and
either knew or should have known that its PCBs would be released into the environment and or
absorbed within an enclosed systems such as school buildings, including Twin Valley.

  163. Defendants had a duty to disclose the known dangers of PCBs. Despite this
knowledge, Defendants never disclosed or otherwise informed its customers, Twin Valley, the
public, or Kristy of the inherent dangers and toxicity of PCBs. Instead, Defendants actively,
intentionally, and or negligently concealed and or omitted material facts as to what Defendants
knew and when Defendants discovered the toxicity and risks of PCBs in general and as
construction materials. Defendants continued to promote and sell PCBs without disclosing the
truth of their toxicity, dangers, and hazards.



76 St. Paul Street
Post Office Box 369

164.    Defendants concealed for many years its knowledge of the dangers, toxicity, and hazards of PCBs. Kristy reasonably relied upon Defendants omissions of material facts and failures to disclose to her detriment. As a proximate cause of said reliance, Kristy has suffered the injuries and damages as alleged herein, including but not limited to:

   a.    The accumulation of PCBs in Kristy's body;

   b.    Kristy's personal injuries, including but not limited to Non-Hodgkin Lymphoma;

   c.    Severe emotional distress; and

   d.    Economic and non-economic damages.

165.    Defendants' misrepresentations were willful, wanton, grossly negligent, and/or in reckless disregard for Kristy's rights, thereby justifying an award of punitive damages against the Defendants.

## Claims for Relief

WHEREFORE, Plaintiff seeks and prays for the following relief from and against all Defendants individually, jointly, and severally:

   A.    Compensatory damages for physical injury, pain, and suffering and mental and emotional distress, pain and suffering (past, present, and future);

   B.    Medical expenses, including future medical monitoring and life care plan expenses;

   C.    Lost wages, employment benefits, and income;

   D.    Loss of enjoyment of life;

   E.    Punitive damages;

   F.    All other damages awarded at law or in equity;

   G.    Attorneys' fees and costs;


gravel &
shea
A PROFESSIONAL CORPORATION
76 St. Paul Street
Post Office Box 369

- 43 -

H.     Awarding prejudgment interest, and punitive damages as permitted by law; and

I.      Any other relief as the Court deems just and proper.

## JURY DEMAND

**Plaintiff demands a trial by jury of all claims in this Complaint so triable.**

Dated:        December 20, 2023

Matthew B. Byrne, Esq.
Gravel & Shea PC
76 St. Paul Street, 7th Floor, P.O. Box 369
Burlington, VT  05402-0369
(802) 658-0220
mbyrne@gravelshea.com
Attorneys For Plaintiff


Gary M. Klinger, Esq.
James DeMay, Esq.
Alexander Rudenco, Esq.
Milberg Coleman Bryson Phillips
Grossman, PLLC
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
(866) 252-0878
gklinger@milberg.com
jdemay@milberg.com
arudenco@milberg.com

Jeff Ostrow, Esq.
Kopelowitz Ostrow P.A.
1 West Las Olas Blvd., Suite 500
Fort Lauderdale, FL 33301
(954) 332-4200
ostrow@kolawyers.com